## Hensley v. Commonwealth.

(Decided February 6, 1923.)

### Appeal from Martin Circuit Court.

1. Homicide—Conspiracy—Question for Jury—Sufficiency of Evidence. —On a prosecution for homicide evidence of a conspiracy held sufficient to take the case to the jury and to sustain the verdict.

2.  Appeal and Error—Criminal Law—Evidence—Failure to Object—
    Waiver.—Where, on a prosecution for homicide, the record does.
    not show that any material evidence was admitted over the ob-
    jection of the accused, accused cannot complain.

3.  Criminal Law—Homicide—Manslaughter—Instructions.—On a pros-
    ecution for homicide failure to give an instruction on manslaughter
    is not error where there is no evidence tending in the remotest de-
    gree to make out a case of manslaughter.

J. B. CLARK for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR,.
Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Appellant, who was charged as a co-conspirator and
aider and abettor of Frank Chapman in the murder of
her husband, was found guilty and her punishment fixed
at life imprisonment.

Appellant and her husband, James Hensley, lived on
Mt. Sterling creek, a tributary of Tug river, in Martin
county, and Frank Chapman had been making his home
with them for about three months. On the day of the
tragedy, John Hale, appellant's cousin, was at her home.
Deceased went away for awhile and on his return appel-
lant and Hale were lying on the bed, some of appellant's
children being present. When the deceased returned, he
"raised a racket," struck Hale two or three times and
ordered him to leave. The only witnesses as to what oc-
curred that night are appellant and her young son, El-
bert Hensley. The latter testified that Chapman was
aiming to shoot his mother and this made his father mad.
His mother then went out of the house, and after that
his father and Chapman had a scuffle and Chapman
drove his father out of the house. They had not been out
of the house very long until a shot was fired. Later on
appellant came back into the house, and after stating to
witness that she had heard a gun and his papa making
a noise, said, "Let's get a light and go and see about
him." After leaving the house and going down the road
a short distance, they found deceased in a branch and
Chapman nearby with a pistol in his hand. With the as-
sistance of Chapman they carried the deceased to the
house, where appellant pulled off his shoes and witness
helped to pull off his overalls. They then placed the de-
ceased in bed. After that appellant went into another
room and went to bed, and it was not long until the de-

ceased rolled out of the bed on to the floor. When he did this, appellant came in and assisted witness in putting some cover on and under deceased and left him lying on the floor. After that appellant returned to her room and went to bed. All this time Chapman was in the room with deceased, and he and the witness occupied the same bed. When witness woke up the next morning, the deceased had been placed back on the bed and appellant told him that he had died about five o'clock. Shortly thereafter they all ate breakfast which was prepared by appellant. After breakfast appellant and Chapman both told witness to catch the mule so that he could go out and tell the folks to come in and help. The first person to whom he broke the news was Elbert Elkins, who lived about a quarter of a mile down the hollow from the home of the deceased. It was shown that deceased was shot in the face, the bullet passing out behind.

Elbert Elkins testified that after being informed of the death of the deceased, he went to the home of appellant, who stated to him that deceased was drunk and had gotten down in the branch and frozen to death. When witness turned the sheet down and saw the wound on the face of the deceased, he asked appellant what had caused that. She replied that deceased must have snagged it by falling on a snag. Appellant also stated to witness that at the time of the homicide she was out in a crib near the house, having gone out there to prevent her husband from whipping her, as he had threatened to do, and that she stayed out there practically all night. At the inquest both appellant and Chapman testified that the wound in the face of the deceased was caused by his falling on a snag.

Lila Marcum and Sarah Runyons both testified that they and appellant were at the home of Henry Maynard a few days before the homicide, and that appellant said she intended "to have her husband made away with if she had to make away with him herself." At the time she made the statement they and appellant were drinking liquor which appellant had brought with her under her apron. Sarah Runyons also stated that in the same conversation appellant was telling about how well she loved Frank Chapman and how much money he had given her. In the same conversation she also told Sarah Runyons that she needn't be surprised to hear of her husband's death at any time, and that she had slept two nights with Frank Chapman.

It was shown by the witness, Will Spradling, who was one of the coroner's jury, that appellant said that no shot was fired, and that she was out in the crib when she woke up and heard her husband struggling in the stream. It was further shown by this witness and others that Elbert Hensley stated in their presence that after the deceased rolled off the bed, he and his mother put some quilts under him and on him, and thought he would be warm, and his mother and the baby then went to bed in the same bed the deceased had rolled from and slept there the remainder of the night.

According to appellant's testimony, Chapman and the deceased had gone down the road to where there were two women. On their return her cousin, John Hale, was lying across the bed and she was seated on the side of the bed. Chapman made the deceased run Hale off because he was afraid Hale would tell about their moonshining. This made her mad and, after Hale left, she said, "If God lets me live until morning I will go and turn this up." Chapman said, "I will just shoot your brains out, it is just what I will do," and then threw his gun in her face. Her husband knocked the gun down. She then left the house thinking they would quiet down and took her little girl with her. After she left, she heard her husband and Chapman talking. One said, "Hello, is that you, Frank?" and the other replied, "Hello, Jim, is that you?" About that time a gun was fired and she said, "Lord have mercy, one of them is killed." On going to where her husband was she found Chapman there, who said, "Where in the hell are you going?" She replied that she was going to see about Jim. He told her that Jim was down there drunk and she asked permission to bring him to the house. He told her that she could go, but if she opened her mouth he would kill her. When she reached her husband and asked him what was the matter, he said, "Frank has killed me." She then said, "Jim, honey, can you get to the house?" He replied, "Mary, I will try." She then went down into the water up to her knees and took him by the arm, but couldn't get him to the house. She returned to the house and asked Frank to let Elbert go and help her. Frank finally consented, but said that he didn't want the boy to tell anything. She and her little boy did not have strength enough to get him to the house and asked Frank to help them. He made like he had been hit with an axe, and said that his arm was so sore that he didn't know whether he could help or

not. They finally got her husband to the house and laid him on the bed, and it was so dark that she didn't like to leave the child there alone. She then took her husband's wet clothes off and put dry underwear on him. At that time her husband was still alive. She denied her son's statement that, after deceased rolled off the bed, they put cover on him and she then went back to bed, but says that she sat up all night with her husband until he died the next morning. She also denied the statements made by the two witnesses, Lila Marcum and Sarah Runyons. She accounted for her failure to send for a doctor or to call in the neighbors by the fact that she was afraid of Frank Chapman, and that her fear of him continued even after he was arrested because he might come clear. She also said that her statements as to the manner of her husband's death were made because of her fear of Chapman.

One of the grounds urged for reversal is that the verdict is not sustained by sufficient evidence. Summarizing the Commonwealth's evidence, the following facts appear: Before the homicide, appellant boasted of her love for Frank Chapman and of the amount of money he had given her. She said that she intended to have her husband made away with, even if she had to do it herself, and that the person to whom she was talking need not be surprised to hear of her husband's death at any time. Her husband was angry when he returned and found her and Hale together. Soon after she left the house, she was followed by her husband and Chapman, who shortly thereafter killed her husband. Though her husband was alive when he reached the house, she let him lie on the floor and made no effort to secure any assistance, or to have anyone attend him. When her neighbors came in, she did not tell how her husband's death occurred, but stated that he was frozen to death, and accounted for the wound on the theory that he fell and struck a snag. Though she says she made these statements because of her fear of Chapman, it does not seem reasonable that her fear caused her to conceal the truth after Chapman was arrested by the officers. In view of these circumstances, we cannot say that the evidence of a conspiracy was not sufficient either to take the case to the jury or to support the verdict.

Another contention is that the court permitted the Commonwealth to prove things said and done by Chapman not in the presence of appellant before a *prima facie*

case of conspiracy was made out. In a discussion of this point we need go no further than to say that we have examined the record with great care and have failed to find a single instance where any material evidence of the kind referred to was admitted over the objection of appellant. That being true, appellant can not now complain.

The instructions given are not subject to criticism, and there being no evidence that tended in the remotest degree to make out a case of manslaughter, the court did not err in failing to give an instruction on that subject.

Judgment affirmed.